IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| KEESHA KNUTSON, | ) | No. 32540-7-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WENATCHEE SCHOOL DISTRICT | ) | |
| #246, a Washington school district, | ) | |
| | ) | |
| Respondent. | ) | |

LAWRENCE-BERREY, J. — Keesha Knutson, the former director of childcare
programs for the Wenatchee School District, sued the school district for a hostile work
environment based on gender, retaliation for reporting a hostile work environment, and
violation of her due process rights. She alleged her harasser was Les Vandervort, the
school district's chief financial officer, who served as Ms. Knutson's direct supervisor for
most of her employment. The trial court granted the school district summary judgment
on all claims and dismissed Ms. Knutson's complaint with prejudice. Ms. Knutson
appeals the hostile work environment and retaliation claim dismissals, contending the

trial court erred in concluding that certain acts occurred outside the statute of limitations. She also claims that there are genuine issues of material fact regarding her hostile work environment and retaliation claims. We conclude that summary judgment dismissal was appropriate and affirm.

FACTS

Keesha Knutson was the director of childcare programs for the Wenatchee School District. In this position, she oversaw the school district's after-school day care program, the Westside Early Learning Center for preschoolers, and the summer camp day care program. The school district terminated Ms. Knutson's employment on June 30, 2011, when it eliminated the position of director of childcare programs.

During her employment at the school district, Ms. Knutson received positive performance reviews. In each of her first three years of employment, the reviews stated she exceeded all expectations. In her July 19, 2005 performance evaluation, her supervisor, Mr. Vandervort, wrote, "'Keesha, you're great to work with and I appreciate you.'" Clerk's Papers (CP) at 5. In Ms. Knutson's September 16, 2008 performance evaluation, Mr. Vandervort complimented her "'strong work ethic and helpful management style [that] model the characteristics critical to developing an effective child care team.'" CP at 5 (alteration in original). According to her June 29, 2010 performance evaluation, the last evaluation, Ms. Knutson performed "'satisfactory'"

2

work. CP at 5.

A.    *Ms. Knutson's and Mr. Vandervort's pre-October 2008 working relationship*

Ms. Knutson and Mr. Vandervort enjoyed a warm work friendship until October 2008. The two conversed about their respective personal lives and shared confidences. Mr. Vandervort flirted with her and sent flirtatious e-mails. Ms. Knutson testified that school district Human Resources Director Steve Cole knew of the flirtation before December 2008.

At a 2006 school district conference in Tacoma, Ms. Knutson sat alone at night in her hotel room watching a television show. Mr. Vandervort came to her room to watch the show. According to Ms. Knutson, she did not invite him. Mr. Vandervort claims she invited him. The television show ended at 9 p.m., but Mr. Vandervort stayed an additional 5 to 10 minutes. He spoke to Ms. Knutson about his marriage and personal life. Ms. Knutson participated in the conversation. She did not find the conversation offensive. She was uncertain as to whether to characterize her reaction to the conversation as one of discomfort. Ms. Knutson did not know Mr. Vandervort well and did not know how to respond to his presence. After 5 to 10 minutes, Ms. Knutson stated she was tired and needed to go to bed. Mr. Vandervort left the room. Ms. Knutson did not complain about this incident to the school district administration. She was worried about rumors because she and Mr. Vandervort both had spouses.

3

During work and in his office, Mr. Vandervort spoke to Ms. Knutson about an HBO program, *Cathouse*. The conversation occurred between 2005 and 2007. Ms. Knutson lacked knowledge of the program. In her deposition, she recalled few of the details of this conversation. Mr. Vandervort explained that the show centered on the Bunny Ranch, a house of prostitution, and he stated that his favorite girls on the show were Sunset and Summer. He lightheartedly told her that being the owner of the Bunny Ranch would be a perfect job. In her deposition, Ms. Knutson testified she was not offended by the conversation. However, in an affidavit, Ms. Knutson claimed that she considered the remarks odd and that she was uncomfortable with the conversation. She did not report the conversation to the school district administration. Ms. Knutson likely mentioned the conversation to some female coworkers.

Ms. Knutson separated from her ex-husband in May 2007, and she informed Mr. Vandervort of the separation. Shortly after the separation, Mr. Vandervort telephoned Ms. Knutson to ask her how she was doing. During this conservation, Mr. Vandervort shared information that he had had an affair with another woman during the time that he and his former wife had experienced marital difficulties. Ms. Knutson did not report this telephone call to the school district administration.

On multiple occasions, Mr. Vandervort invited Ms. Knutson to dance at the district office. Mr. Vandervort taught line dancing at the school district for employees'

4

recreation. Ms. Knutson knew line dancing, and Mr. Vandervort asked her to help teach. While in his school district office, Mr. Vandervort asked Ms. Knutson a couple times if she could teach him some line dancing moves. She declined. When she did not appear at the classes, Mr. Vandervort emphasized that she should attend the class. Ms. Knutson did not report the conversations about line dancing because she was office friends with Mr. Vandervort. During her deposition, she admitted that she did not file a complaint because she had nothing to complain about.

On one occasion in 2006 or 2007, Ms. Knutson and her sister saw Mr. Vandervort at Costco. Ms. Knutson noticed Mr. Vandervort staring at her breasts. Ms. Knutson's sister later stated that Mr. Vandervort could not get his eyes "'off your boobs.'" CP at 144. Ms. Knutson did not report the incident to anyone at the school district before her employment ended. She stated she had no reason to report the incident.

On several occasions, Mr. Vandervort told Ms. Knutson that if she wished to talk to someone, she could speak with him at any time. He offered to listen as a work friend. As a genuine expression of friendship, Mr. Vandervort told Ms. Knutson, "'If there's anything you need, I'd do anything for you.'" CP at 155. Mr. Vandervort recorded music CDs (compact disks) for Ms. Knutson. Ms. Knutson did not know if he recorded CDs for others. Ms. Knutson stated that she viewed this action as a kind gesture and did not complain about this conduct.

5

In March 2008, Mr. Vandervort offered to loan Ms. Knutson money to complete a Spanish class needed to obtain a bachelor's degree. Ms. Knutson considered the offer inappropriate and did not want to be indebted to her supervisor. She was not offended, but she was uncomfortable and told him so. In the September 2008 performance evaluation, Mr. Vandervort stated that Ms. Knutson needed to complete her bachelor's degree. When Ms. Knutson objected to this entry in her performance evaluation, Mr. Vandervort reminded her that he had offered to pay for the schooling.

In June 2008, Ms. Knutson came to the school district office on a day off. She wore shorts and a tank top with a scooped neckline. Mr. Vandervort later informed her that another employee had complained about her dress. Ms. Knutson expressed frustration to Mr. Vandervort that the complaining party did not know the full circumstances. Mr. Vandervort rejoined, "'I don't know. I kinda like your cleavage.'" CP at 148. Ms. Knutson considered the remark to be a light-hearted statement. She was not offended because the two were workplace friends who joked. Mr. Vandervort denied uttering the remark.

As a result of the June 2008 complaint about Ms. Knutson's dress, Mr. Vandervort's September 2008 performance evaluation of Ms. Knutson included the remark, "'As a role model, you set the standard for appropriate dress.'" CP at 150. Ms. Knutson asked Mr. Vandervort if he had placed that comment in her evaluation because

6

of the June incident, and he said yes. CP at 151. Ms. Knutson had never before received complaints about her dress. Ms. Knutson asked Mr. Vandervort if he had put the remark in the performance evaluation so no one could complain anymore. Mr. Vandervort laughed and said in a flirtatious manner, "'Well.'" CP at 153. Ms. Knutson did not complain about this incident to the administration. The overall performance evaluation given by Mr. Vandervort in September 2008 was positive.

B.      *Ms. Knutson's and Mr. Vandervort's post-October 2008 working relationship*

Ms. Knutson divorced her husband. She testified that she began dating Russ Waterman, a school district employee in October 2008. Around that time, Mr. Vandervort called Ms. Knutson into his office and said he had heard she was dating Mr. Waterman. Mr. Vandervort asked if Ms. Knutson thought the dating relationship was a smart idea, to which Ms. Knutson replied, "'What does that mean? Do you know something I should know?'" CP at 126. Mr. Vandervort looked at her and performed a familiar gesture of extending his hand and shaking his head. Ms. Knutson asked, "'If you know something, tell me.'" CP at 126. Mr. Vandervort just looked at Ms. Knutson. Mr. Knutson said, "'If that's all, I'm going to go." CP at 126. She left Mr. Vandervort's office.

According to Ms. Knutson, the hostile work environment imposed by Mr. Vandervort started after the October 2008 interaction about Mr. Waterman. In her

deposition, she stated the relationship "changed 100 percent." CP at 161. The rapport changed from friendly to cold and aloof, and Ms. Knutson stated that she received a cold shoulder thereafter. Mr. Vandervort refused to answer Ms. Knutson's job questions, particularly queries about the budget. After October 2008, Ms. Knutson did not consider herself friends with Mr. Vandervort. He was no longer flirtatious with her. Mr. Vandervort stopped sitting with her at monthly leadership meetings. Previously, the two always sat together. Ms. Knutson did not ask Mr. Vandervort why he no longer sat next to her, since the two no longer spoke to each other.

A series of three consecutive meetings on December 16, 2008 punctuated the souring relationship between Ms. Knutson and Mr. Vandervort. The first meeting convened in Mr. Vandervort's office. Attending the meeting were Ms. Knutson, Mr. Vandervort, Mr. Cole, and Lisa Turner, the district's human resources manager. Mr. Vandervort informed Ms. Knutson of the meeting and indicated the subject would be staffing issues.

During the first December 16 meeting, Mr. Vandervort "yelled" at Ms. Knutson and directed her not to call the out-of-school program "school age care." CP at 111. He insisted on the title "daycare." CP at 96. He informed Ms. Knutson that her calling the program "school age care" caused confusion. CP at 99. Mr. Vandervort knew that Ms. Knutson wanted the program to be educational in nature, but he relegated the program to

day care. Ms. Knutson does not dispute that Mr. Vandervort held authority to direct her to call the program a "daycare" program. CP at 98. She notes, however, that all of the school district written handbooks used the term "school age care." CP at 99.

During this first December meeting, Mr. Vandervort also scolded Ms. Knutson for missing a school district leadership meeting and informed her that she must attend all leadership meetings. Mr. Cole reiterated the importance that Ms. Knutson attend leadership meetings. Ms. Knutson became upset, but not angry. Ms. Knutson felt the directions to attend leadership meetings were not fair because Mr. Vandervort had previously told her that program directors were no longer to attend the meetings. Ms. Knutson did not tell Mr. Cole during this meeting that Mr. Vandervort had said directors should not attend. The parties resolved the issue with Ms. Knutson agreeing to attend the meetings.

During this meeting, Mr. Vandervort directed Ms. Knutson to keep "regular work hours"; however, he did not define "regular hours." CP at 97, 106. Ms. Knutson came to work later on Mondays so she could take her son to school, but she stayed at work later the first workday of the week. Mr. Cole said he would not nitpick Ms. Knutson's work hours. There was no directive at the end of the meeting that Ms. Knutson would work any certain hours. Mr. Vandervort did not object to Ms. Knutson's coming to work later on Mondays.

Ms. Knutson informed Mr. Cole that she lacked an office and work computer at the school district administration building. Mr. Cole expressed shock that Ms. Knutson had no office in the district building. Ms. Knutson explained to Mr. Cole and others that the lack of an office and computer required her to continually travel between home and school. Ms. Knutson had previously asked Mr. Vandervort for office space.

During this meeting, Mr. Cole told Ms. Knutson that an employee, Krissy Quilter, did not wish to receive text messages. Ms. Knutson agreed to send no texts to Ms. Quilter. Ms. Turner and Mr. Cole left Mr. Vandervort's office, but Mr. Vandervort and Ms. Knutson continued to talk. Ms. Knutson referred to this short interaction after Ms. Turner and Mr. Cole left as the second meeting of December 16.

During this second meeting, Ms. Knutson asked why Mr. Vandervort told her that program directors were no longer desired at leadership meetings. Ms. Knutson asked Mr. Vandervort that if he intended to change the rules, he let her know what to expect. In reply, Mr. Vandervort yelled at Ms. Knutson, stating, "'What are you talking about? I did not say that.'" CP at 113, 116. Ms. Knutson reminded Mr. Vandervort of the meeting when he told her that directors should no longer attend leadership meetings. He then remarked, "'I can't believe you didn't throw me under the bus. I forgot about telling you that.'" CP at 116-17. Ms. Knutson also reminded Mr. Vandervort that he had approved her flexible work schedule because of her different work sites.

10

At the conclusion of this second meeting, Ms. Knutson walked directly to Mr. Cole's office and complained to him about Mr. Vandervort's behavior. Ms. Turner was present during this third meeting. Ms. Knutson considered this the third December 16 meeting. Ms. Knutson told Mr. Cole that she wanted the hostile treatment from Mr. Vandervort stopped. During this meeting, Ms. Knutson complained to Mr. Cole about a series of actions by Mr. Vandervort. Ms. Knutson told Mr. Cole that Mr. Vandervort offered to pay for her Spanish class and meet her off campus to study. She complained that Mr. Vandervort mentioned in her performance evaluation that she lacked a college degree. Ms. Knutson also complained about Mr. Vandervort talking with her about inappropriate personal subjects.

During this third December 16 meeting, Ms. Knutson also explained to Mr. Cole that Mr. Vandervort grew angry with her once he learned she had a boyfriend and that is when the hostile treatment commenced, including Mr. Vandervort yelling at her in meetings and ignoring her in the hallways. During the meeting, Ms. Knutson asked for a different supervisor. Mr. Cole asked if Ms. Knutson wished to file a formal complaint. She responded that she did not want to lose her job, she just wanted Mr. Vandervort's behavior to stop. Mr. Cole said okay and the meeting ended. During the last December 16 meeting, or a later meeting, Ms. Turner told Ms. Knutson, "'If you want to swim in the swamp, you better make nice with the alligators.'" CP at 276.

11

The hostile work atmosphere continued after the December 16, 2008 meetings. The silent treatment in the hallways continued. On one occasion, Mr. Vandervort walked by Ms. Knutson at the school district front desk and Ms. Knutson greeted Mr. Vandervort but he just walked by. Ms. Knutson believed Mr. Vandervort ignored her on other occasions, but she could not recall the details.

In February 2009, Ms. Knutson was called into Ms. Turner's office to discuss staffing and budget reductions. Mr. Vandervort had previously advised Ms. Knutson of a need to reduce her budget by $50,000. During the meeting, Mr. Vandervort asked Ms. Knutson for a report he claimed he asked her to write. According to Ms. Knutson, Mr. Vandervort had not asked for any report, only ways to cut the budget. Ms. Knutson had already put in writing how to cut the budget by $50,000. Mr. Vandervort looked at Ms. Knutson, threw his arms into the air, raised his voice, looked at Ms. Turner, and said, "'See! I get nothing! I just get nothing!'" CP at 124, 172.

Mr. Vandervort concedes that he may have raised his voice due to frustration during the February 2009 meeting with Ms. Turner and Ms. Knutson. Mr. Vandervort claims he would have used the same tone of voice if he had addressed a man under the same circumstances. He purports to be direct with all employees and claims that on the rare occasions that he raises his voice, his tone is directed more at men than women. Chet Harum, executive director of student and support services, and Ms. Turner testified

that each has heard Mr. Vandervort raise his voice with both male and female employees.

Exhibit 9 to Ms. Knutson's deposition is a three-page e-mail string between Ms. Knutson and Mr. Vandervort, which begins on April 24, 2009. The school district presented the content of the e-mail to contradict Ms. Knutson's claim that a hostile work environment began in October 2008. In an April 27, 2009, 6:45 a.m. e-mail, Ms. Knutson wrote to Mr. Vandervort about his visiting a day care program:

> "Good morning. I can do any day or time. I'd love for you to come out. It has been a long time and would be fun. Your schedule is probably harder to find time, so just let me know even if last minute the time opens up for you." . . . "Should I make a CD for road trip? Hahah."

CP at 188-89.

In June 2009, Mr. Vandervort asked Ms. Knutson to telephone Natalie, a person who did not work for the school district but who wanted to conduct a summer camp at a school district facility. Mr. Vandervort directed Ms. Knutson to tell Natalie no. CP at 183. Before calling, Ms. Knutson wanted to speak with the school district licensor to discuss limitations on outside groups using district facilities. Mr. Vandervort called Ms. Knutson into his office the following day, upset that she had not yet called Natalie. He yelled at Ms. Knutson, "'Why the hell haven't you called her or called her back yet?'" CP at 185. He accused Ms. Knutson of insubordination. According to Mr. Vandervort, his reaction to her was not the result of her being a woman.

13

In July or August 2009, Mr. Cole told Ms. Knutson that Mr. Harum would be her new supervisor. Ms. Knutson stated that Mr. Harum did not create a hostile work environment toward her. Mr. Vandervort's last performance evaluation of Ms. Knutson occurred in September 2008, which preceded the alleged hostile work environment.

In September or October 2009, Mr. Vandervort and Ms. Knutson passed on the stairs in the Wenatchee School District administration building. Ms. Knutson stopped Mr. Vandervort. She wanted to rebuild the relationship. Although Mr. Vandervort was no longer her supervisor, Ms. Knutson asked if she had made progress in her work performance. Mr. Vandervort responded that he had attempted to promote her to a director but the promotion might not be beneficial. Ms. Knutson asked Mr. Vandervort to explain. He stated that he was on the way to a cabinet meeting and could not talk then.

Ms. Knutson met with Mr. Harum and Mr. Vandervort in October 2010 to discuss the budget. Mr. Vandervort raised his voice and stated that he was not getting information he wanted on the budget. Ms. Knutson mentioned some ideas for the budget and offered suggestions to charge parents for summer camps. She mentioned missing money from one of her accounts. Ms. Knutson said that Mr. Vandervort's finance department failed to provide her information needed for the budget. Mr. Vandervort snickered and rolled his eyes at her. Mr. Vandervort became angry and expressed displeasure about Ms. Knutson's handling of the budget process. Ms. Knutson felt

14

humiliated.

Mr. Vandervort left the meeting, and Ms. Knutson sat alone with Mr. Harum. She then complained about Mr. Vandervort's behavior. She told Mr. Harum that she had spoken with Mr. Cole and Ms. Turner and had hoped the hostile work environment would end with a new supervisor. She was upset that the antagonistic environment continued. Mr. Harum said that he observed the hostility and that he would speak with Mr. Vandervort to end the hostility.

Ms. Knutson complains that after her reporting of Mr. Vandervort to Mr. Cole, the school district, primarily Ms. Turner and Mr. Vandervort, repeatedly wrote negative comments about her job performance. According to her, the school district also refused to provide information to her regarding grant money that funded her program, making it impossible for her to create budget reports. She also believes that the school district refused to respond to her e-mails expressing concerns over responsibilities and expectations being placed on her without adequate experience or training. In February 2011, the school district placed Ms. Knutson on a personal improvement plan, a version of formal discipline.

C.  *Mr. Vandervort's treatment of other female employees*

In response to the school district's summary judgment motion, three former female employees—Melissa Campbell, Sandra Mueller, and Trisha Johnson—signed affidavits

critical of Mr. Vandervort and the school district's human resources department. Ms. Campbell worked at the school district from 2005 to 2010. She first served as the substitute teacher coordinator in the human resources department. By 2007, Ms. Campbell worked as substitute teacher coordinator/human resources secretary under the supervision of Ms. Turner and Mr. Cole.

According to Ms. Campbell, Mr. Vandervort worked in the same office building as the human resources staff. Thirty to 40 females and 3 males worked in the school district administration office. According to Ms. Campbell, Mr. Vandervort tried to dominate the office and disliked being confronted or questioned. According to Ms. Campbell, Mr. Vandervort responded to unpleasant questions with the "f" word. CP at 285. Because of his frequent "WTF [what the f***]" looks, Mr. Harum drew a caricature of him for the 2008 superintendent's cabinet. CP at 285. Mr. Vandervort and Kevin Bredesen, an earlier human resources director, butted heads and screamed at each other.

Ms. Campbell testified that Mr. Vandervort was fine to work with and be around as long as you were on his "good side." CP at 284. If one "got on his bad side," he grew cold and hostile. CP at 285. Mr. Vandervort enjoyed causing discord between finance department and human resources department personnel. He initiated marshmallow fights with marshmallow guns and tossed rubber balls or screaming monkeys across a divider

between the finance and human resource departments. According to Ms. Campbell, a running joke in the school district office was that one needed to treat Mr. Vandervort like a weapon and "'point him away from you.'" CP at 285.

In her affidavit, Ms. Campbell related a conversation she had had with Mr. Vandervort in which he spoke about a finance department employee, Trisha Johnson. The school district had terminated Ms. Johnson's employment purportedly because of budget constraints. Mr. Vandervort told Ms. Campbell that he would wait a few months and then re-post the job with different qualifications so that Ms. Johnson would lack the qualifications and Linda Honeywell, another employee, would fill the opening.

According to Ms. Campbell, Mr. Vandervort performed Ms. Knutson's budget tasks for the day care program. After Ms. Knutson began to date Mr. Waterman, Mr. Vandervort ended this assistance. One year, Ms. Campbell wore a "Kiss Me I'm Irish" shirt on St. Patrick's Day. On that day, without warning, Mr. Vandervort kissed Ms. Campbell full on the lips in front of other staff members. Ms. Campbell spoke to Mr. Cole about the kiss in the presence of Ms. Turner. Mr. Cole appeared shocked, grew pale, and asked Ms. Campbell if she wanted him to speak with Mr. Vandervort. Ms. Campbell said no. CP at 286. Ms. Turner laughed. Ms. Campbell wore her shirt again the next St. Patrick's Day, and Mr. Vandervort kissed her again. She never wore the shirt again.

17

The second female former employee who signed an affidavit, Ms. Mueller, worked at the school district in the human resources department from 2004 until 2012. She described Mr. Vandervort as unprofessional and disrespectful to staff, including Ms. Knutson. According to Ms. Mueller, Mr. Vandervort threw personnel requisitions in the trash as people submitted them. On one occasion around 2010, Mr. Vandervort confronted Ms. Mueller and asked why she limited interaction with him. Ms. Mueller stated she did not like how he treated others. Mr. Vandervort asked her if she referred to his treatment of Ms. Knutson. The queries led to a one-hour conversation about Mr. Vandervort's disruption of others' work. Ms. Mueller told Mr. Vandervort that she had issues with how he treated Ms. Knutson but that he also mistreated others. After this conversation, Ms. Mueller's performance evaluations lowered. Ms. Mueller complained to Ms. Turner about this and said, "'You are documenting me out of this job[,] aren't you.'" CP at 292. Ms. Turner replied, "'No, maybe you are no longer suited for this position.'" CP at 292. Ms. Turner told her that maybe she should start looking for a new job. Shortly thereafter, Ms. Mueller found a new job outside the school district.

The third female former employee who signed an affidavit was Trisha Johnson, who worked at the school district from March 2004 to February 2006 as Mr. Vandervort's assistant and as an assistant accountant. According to Ms. Johnson, the atmosphere in the school district office was cliquish. Mr. Vandervort was initially

18

friendly to Ms. Johnson but eventually excluded her from office activities. Mr. Vandervort criticized her job performance but was vague in his criticism. Ms. Johnson noticed Mr. Vandervort giving female employees back rubs and receiving back rubs from the female employees.

In February 2006, the school district terminated Ms. Johnson's employment. Mr. Vandervort told Ms. Johnson that the school district had to eliminate the finance assistant position that another employee occupied due to budget cuts and because there was not enough work. Because the other employee had seniority, that employee received Ms. Johnson's job. One year later, the employee who took Ms. Johnson's job as assistant accountant left and the position was posted. Ms. Johnson submitted an application for the position but received no call for an interview.

D.    *The disputed budget shortfall of 2010-2011*

    *1.    The district's claims*

According to Mr. Vandervort and school district Superintendent Brian Flones, as a result of the 2008 national recession and decreased state funding, the school district initiated cost saving measures. During the 2009-2010 school year, the school district did not replace 20 retired certified staff positions. During that year, the school district terminated the employment of and eliminated the positions of assistant director of maintenance and the school age care billing clerk.

Even after the cuts of 2009-2010, the programs lost money. By the spring of 2011, state funding for the Wenatchee School District had decreased in the sum of $3 million and further decreases were anticipated. In March 2011, the school district contemplated further reductions in staff and cuts in the day care program. The school district board of directors directed the school district's administrative cabinet to consider cuts to self-sufficient programs that incurred losses. The school age care program was such a program.

The administrative cabinet consisted of Mr. Flones and several high-ranking administrators, presumably including Mr. Vandervort. Mr. Vandervort provided budget information to assist the cabinet and the board. The cabinet recommended elimination of Ms. Knutson's position, in addition to other budget cuts, including not replacing 10 certified staff, a reduction in force of 33[1] classified staff, and the elimination of a part of the school age care program. The board accepted the cabinet's recommendation and terminated Ms. Knutson's position along with the others described above. The district states that the decision to terminate Ms. Knutson was budget driven and had nothing to do with her complaints concerning Mr. Vandervort.

2.    *Ms. Knutson's claims*

---

[1] This number is 34 in one administrator's declaration but 33 in the district's interrogatory answer.

20

School district financial records show that the district finished the 2008-2009 fiscal year with $2,199,024.81 in excess revenue. The school district finished the 2009-2010 fiscal year with $1,281,589.17 in excess revenue, finished the 2010-2011 fiscal year with $826,782.93 in excess revenue, and finished the 2011-2012 fiscal year with $1,046,705.03 in excess revenue. During those years, the school district increased expenditures.

Of the 33 classified staff that the school district laid off in 2011, the school district rehired 24. Of the 9 not rehired, 4 retired or quit.

Similar to the 24 who were rehired, Ms. Knutson also attempted to become re-employed with the school district. On October 7, 2011, the school district posted an open position for an early learning coordinator at the Westside Early Learning Center. Ms. Knutson applied for the job but was not afforded an interview. According to Ms. Turner, no one was granted an interview or hired for the position. The school district mistakenly believed it needed a licensed early learning supervisor to lead the preschool care program, but later discovered otherwise.

E.    *Procedure*

Ms. Knutson ultimately filed a lawsuit against the Wenatchee School District on October 30, 2012, alleging she was subject to a hostile work environment and terminated from employment because of her gender in violation of RCW 49.60.180. She claimed

21

that the school district retaliated against her after she engaged in statutorily protected activity in violation of RCW 49.60.210 and that the school district violated her constitutional due process rights when firing her.

The school district filed a motion for summary judgment to dismiss all three claims. The trial court granted the motion and dismissed all claims. The trial court dismissed Ms. Knutson's hostile work environment claim by excluding from consideration events occurring prior to the statute of limitations running and by finding the conduct occurring before and after the statute of limitations to be "not the same course of behavior." CP at 356. The trial court concluded that Ms. Knutson failed to support her retaliation claim since there was no question of fact as to a causal link between Mr. Vandervort's behavior and the elimination of Ms. Knutson's position.

## ANALYSIS

A.  *Whether Mr. Vandervort's conduct that occurred outside the statute of limitations period may be considered when assessing Ms. Knutson's claim for a hostile work environment*

Initially, we must address what acts this court may consider when determining whether the trial court correctly granted summary judgment to the school district on Ms. Knutson's claim of a hostile work environment. The school district argues that the purported sexually motivated remarks and conduct of Mr. Vandervort that occurred before the relationship between Mr. Vandervort and Ms. Knutson changed in October

22

2008 cannot be considered because the comments and behavior occurred outside the statute of limitations. Ms. Knutson argues that Mr. Vandervort's remarks and actions before October 2008 may be considered because the comments and behavior were part of a pattern of discrimination that constituted a hostile work environment.

The trial court determined as a matter of law that the relevant acts that could be considered in Ms. Knutson's hostile work environment claim were only those that occurred within the statute of limitations period. Since Ms. Knutson filed suit on October 30, 2012, acts occurring before October 30, 2009 were outside the statute of limitations. As detailed above, Ms. Knutson claimed that she was subject to flirtatious conduct or unwelcome advances until the Waterman conversation of October 2008. After that date, her relationship with Mr. Vandervort changed and Mr. Vandervort never again communicated with her in a flirtatious manner. After October 2008, he grew cold and aloof and yelled at Ms. Knutson for her job performance. The trial court excluded actions that occurred outside the statute of limitations since they were of a different character than those inside the statute of limitations.

Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW, prohibits employment discrimination based on sex. RCW 49.60.010, .030, .180. RCW 49.60.180(3) makes it an unfair practice for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of . . .

23

sex." RCW 49.60.030(2) authorizes a person discriminated against in violation of WLAD to bring a civil action. Two types of sex discrimination claims are recognized—the quid pro quo sexual harassment claim, where the employer requires sexual consideration from the employee for job benefits, and the hostile work environment claim. *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004). Ms. Knutson asserts a hostile work environment. The four elements of a prima facie hostile work environment claim are (1) the harassment was unwelcome, (2) the harassment was because of sex, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer. *Glasgow v. Ga.-Pac. Corp.*, 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985).

The WLAD does not contain its own limitations period. Discrimination claims must be brought within three years under the general three-year statute of limitations for personal injury actions. RCW 4.16.080(2); *Antonius*, 153 Wn.2d at 261-62. An issue that arises in these cases is whether discriminatory or hostile conduct of the defendant or the defendant's employee that occurs outside the limitation period may be included in the calculus of a hostile work environment if some impermissible conduct occurs inside the limitation period.

For example, in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the United States Supreme Court addressed this

24

issue in the context of a charge of discrimination and retaliation with the Equal Employment Opportunity Commission under federal law. The plaintiff claimed, among other things, a racially hostile work environment during his employment. *Id.* at 104-05. The employer argued that it was entitled to partial summary judgment as to acts occurring before the relevant 300-day limitations period for filing such charges under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17, that precludes employment discrimination on account of sex. *Morgan*, 536 U.S. at 106. The Court distinguished those cases involving discrete retaliatory or discriminatory acts, such as termination, failure to promote, denial of transfer, or refusal to hire, from cases involving claims of a hostile work environment. For discrete acts, the Court noted that the limitations period runs from the act itself, and if the limitations period has run, a discrete act is not actionable even if it relates to acts alleged in timely filed charges. *Id.* at 113. However, the Court concluded that "[h]ostile work environment claims are different in kind from discrete acts[ and t]heir very nature involves repeated conduct." *Id.* at 115.

The Court stated that an "'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts." *Id.* (citation omitted). The Court explained that a hostile work environment claim is composed of a

25

series of separate acts that collectively constitute one "'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).

Because Title VII's filing provision requires only that the charge be filed within a certain period after the unlawful practice occurred, the Court reasoned it does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. *Id.* The Court held that "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* Nevertheless, the acts about which an employee complains must be part of the "same actionable hostile work environment practice." *Id.* at 120.

The *Morgan* Court rejected the rule applied by several of the federal circuits that a plaintiff could not base a suit on acts occurring outside the statute of limitations period unless it would have been unreasonable to expect the plaintiff to sue before the statute ran. It did so precisely because the entire hostile work environment claim encompasses a single unlawful employment practice. *Id.* at 117. Thus, it does not matter that a plaintiff knows or should know at the time discriminatory acts occur outside the statute of limitations period that the acts are actionable. *Id.* at 118. The Court explained that its holding did not leave employers defenseless because if an employee unduly delayed suit an employer could assert equitable defenses such as waiver and unreasonable delay, as

26

well as laches if the employer could establish lack of diligence on plaintiff's part and prejudice to the employer as a result of the delay. *Id.* at 121.

Thus, under *Morgan,* a court's task is to determine whether the acts about which an employee complains are part of the "same actionable hostile work environment practice" and, if so, whether any act falls within the statutory time period. *Id.* at 120. The acts must have some relationship to each other to constitute part of the same hostile work environment claim, and if there is no relation, or if "for some other reason, such as certain intervening action by the employer," the act is "no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts" as part of one hostile work environment claim. *Id.* at 118.

In *Antonius,* the Washington Supreme Court adopted the *Morgan* analysis for purposes of suits under chapter 49.60 RCW. There, Rose Antonius began working for King County's Department of Adult and Juvenile Detention as a bookkeeper in 1983. *Antonius,* 153 Wn.2d at 259. In 1985, she was promoted to a position as a corrections officer and worked at the Seattle jail, where she supervised male inmates. She alleged that until she was transferred to an all-female corrections facility in February 1996, she was frequently subjected to sexually derogatory comments by inmates, coworkers, and supervisors, and was exposed to sexually explicit inmate conduct. *Id.* at 259-60. She often encountered pornographic materials, including magazines and videos, in inmate

27

areas, as well as pornographic materials left at correctional officers' workstations. At the all-female facility, she did not encounter this discriminatory conduct.

In December 1996, Ms. Antonius was promoted to sergeant and reassigned to the Seattle jail. In March 1997, she was transferred to the newly opened Regional Justice Center correctional facility in Kent. *Id.* at 259. With her return to the Seattle jail and continuing in her assignment in Kent, Ms. Antonius saw pornographic materials in inmates' residential areas and at workstations, and was exposed to sexually explicit videos. She also was subjected to derogatory comments toward herself and other females. She did not complain, believing that it would not be productive and that it would subject her to ridicule and possible reprisal. *Id.*

Ms. Antonius filed suit against King County on December 22, 2000, alleging the county violated chapter 49.60 RCW by fostering and maintaining a sex-based hostile work environment. The county moved for summary judgment on statute of limitations grounds. The county maintained that Ms. Antonius's suit was untimely as to events occurring more than three years before the suit was filed and that she did not face sex-based discrimination during the limitations period itself. *Id.* at 260. Ms. Antonius countered by arguing that the hostile work environment was a continuing violation giving rise to an equitable exception to the statute of limitations and that she encountered discriminatory conduct during the limitations period. The trial court granted partial

summary judgment in favor of the county as to acts occurring more than three years before Ms. Antonius brought suit. The trial court reasoned that the hiatus in events occurring while Ms. Antonius was assigned to the all-female facility precluded application of a continuing violation exception to the statute of limitations. *Id.*

The court applied the *Morgan* analysis to determine whether the trial court properly granted summary judgment to the county as to any acts allegedly occurring more than three years before suit was filed. *Id.* at 270. The trial court had reasoned that Ms. Antonius failed to demonstrate sufficient facts to show a systemic continuing violation and that she could not show that acts occurring more than three years before suit were part of a serial continuing violation because of the hiatus in events while she was at the Alder Street facility for female inmates. The Court of Appeals, applying *Morgan*, held that the county was not entitled to summary judgment because Ms. Antonius alleged sufficient facts to show an act contributing to the hostile work environment occurred within the limitations period. *Id.* at 265. The county maintained, however, that even under *Morgan* partial summary judgment was proper. *Id.*

The Supreme Court remanded the case to the trial court to determine whether summary judgment was appropriate under *Morgan. Id.* at 271. For purposes of remand, the *Antonius* court rejected the county's argument that a gap in the events precluded a court, as a matter of law, from considering previous acts to be sufficiently related to any

29

acts occurring within the statute of limitations period to constitute a single hostile work environment. *Id.* at 271-72.

The question before us is whether Mr. Vandervort's conduct before Ms. Knutson's relationship with Mr. Waterman constitutes the "same actionable hostile work environment practice" as Mr. Vandervort's conduct after knowledge of Ms. Knutson's relationship with Mr. Waterman. *Morgan*, 536 U.S. at 120. The acts must have some relationship to each other to constitute part of the same hostile work environment claim. An intervening action by the employer could preclude the acts from being part of the same hostile environment claim.

*Burkhart v. American Railcar Industries, Inc.*, 603 F.3d 472 (8th Cir. 2010) is helpful. There, the plaintiff complained about sexual e-mails and comments from her supervisor that occurred outside the statute of limitations and complained about being shunned, suspended, and terminated within the statute of limitations. *Id.* at 474-75. Her male supervisor was suspended for five days as a result of sending the sexually charged e-mails. After the supervisor's suspension, the plaintiff received no further nonwork e-mail or offensive comments from her supervisor. *Id.* at 475. She alleged, however, that she was "'ostracized'" because of her complaint, that other employees exhibited a "'standoff attitude'" toward her, and that the plant manager no longer called her by a nickname. *Id.* The plaintiff sought to claim that all of the conduct was part of one hostile

30

work environment claim, including the sexual e-mails and comments and the alleged

retaliatory actions. *Id.* The court rejected this argument because there was no evidence

that the sexually explicit e-mails or comments continued. *Id.* The alleged retaliatory acts

could not be considered sexual harassment. *Id.* at 476. Thus, the plaintiff's sexual

harassment claim was time barred. *Id.*

Similarly, the conduct of Mr. Vandervort before October 2008 is significantly

different from the conduct thereafter. Mr. Vandervort was no longer engaged in sexual

banter or flirtations. According to Ms. Knutson, the relationship between her and Mr.

Vandervort changed 100 percent. Ms. Knutson does not even characterize Mr.

Vandervort's conduct before October 2008 as hostile. His aloofness may have been

motivated by an unrequited affection engendered before October 2008, but his conduct

changed after October 2008. The conduct after October 2008 is retaliatory in nature,

which *Burkhart* considers different in nature than the sexual misconduct. *Id.* We

conclude that the trial court correctly applied the statute of limitations.

B.     *Whether Ms. Knutson presented prima facie evidence of a hostile work environment*

We review a decision to grant summary judgment de novo. *Campbell v. State*,

129 Wn. App. 10, 18, 118 P.3d 888 (2005). We will affirm the summary judgment only

if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence

of any genuine issues of material fact, entitling the moving party to judgment as matter of law. CR 56(c). The court should consider all facts and all reasonable inferences from them in the light most favorable to the nonmoving party. *Qwest Corp. v. City of Bellevue*, 161 Wn.2d 353, 358, 166 P.3d 667 (2007).

As noted above, the four elements of a prima facie hostile work environment claim are (1) the harassment was unwelcome, (2) the harassment was because of sex, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer. *Glasgow*, 103 Wn.2d at 406-07. The school district does not contest the first and fourth elements. We, therefore, limit our inquiry to the second and third elements. We also limit our inquiry to alleged hostile acts occurring after October 2008 because of application of the limitation period.

*1. Because of sex*

In determining whether harassment occurs "because of sex," the appropriate question is, "would the employee have been singled out and caused to suffer the harassment if the employee had been of a different sex?" *Id.* Under *Glasgow*, gender must be the "motivating factor" for the unlawful discrimination. *Id.*; *Payne v. Children's Home Soc'y*, 77 Wn. App. 507, 514, 892 P.2d 1102 (1995). "Sex" in this context refers to gender, not activity of a sexual nature generally. *John Doe v. Dep't of Transp.*, 85 Wn. App. 143, 149, 931 P.2d 196 (1997).

To establish that offensive conduct constituted sex discrimination, the employee must show that the conduct was (a) directed at women and (b) motivated by animus against them as women. It is not sufficient to show that the employee suffered embarrassment, humiliation, or mental anguish arising from nondiscriminatory harassment. *Payne*, 77 Wn. App. at 514. The dispositive question is whether the employee would have been subjected to harassment if she had been a man. *Id.* at 515.

*Adams v. Able Building Supply, Inc.*, 114 Wn. App. 291, 57 P.3d 280 (2002) is instructive. In *Adams*, the plaintiff's boss was a "rude, boorish, thoroughly obnoxious supervisor prone to outrageous temper tantrums." *Id.* at 293. We evaluated whether his frequent vocal and physical outbursts constituted a hostile work environment based on Ms. Adams's gender. *Id.* at 295-96. We upheld the summary judgment dismissal of the employee's harassment claim, concluding that the conduct was not sufficiently gender specific to support a claim of gender-based harassment. *Id.* at 297-98.

In *Payne*, a female employee sued, claiming that her boss was abusive. She alleged that when the boss talked while upset, he would get red in the face. He paced on the floor and used a demeaning tone of voice. His means of dealing with most women in the office were anger and outbursts. The plaintiff declared, "'It was like you should have known what he needed and wanted before he did.'" *Payne*, 77 Wn. App. at 509. The plaintiff claimed that his behavior toward her was unlike his behavior toward men. *Id.* at

33

514. However, there was also testimony that the employer had angry outbursts toward male employees and the plaintiff failed to present any affidavits from other employees that would show that the boss's behavior was abusive because of sex. *Id.* at 515. The *Payne* court upheld the summary judgment of dismissal concluding that the employee did not come forward with sufficient evidence to establish that her supervisor's conduct was directed at her because of her gender. *Id.*

Ms. Knutson complains that after Mr. Vandervort learned of her relationship with Mr. Waterman, Mr. Vandervort became aloof, stopped sitting with her at monthly leadership meetings, and blamed Ms. Knutson for failing to attend leadership meetings. She contends that Mr. Vandervort also blamed Ms. Knutson for failing to properly prepare a budget for the day care programs when Mr. Vandervort and his finance office were to blame. Ms. Knutson also cites that Mr. Vandervort yelled at her during meetings, ignored her in the hallway, and greeted others in the workroom but ignored her. During a meeting, Mr. Vandervort snickered and rolled his eyes at Ms. Knutson.

Mr. Vandervort's acts after October 2008 are gender neutral because the record shows that Mr. Vandervort also treated male employees in the same rude and aloof manner he treated Ms. Knutson. Ms. Turner and Mr. Harum testified that Mr. Vandervort yelled at both male and female employees. Ms. Knutson testified that Mr. Vandervort ignored her in the workroom but he greeted other women, illustrating a lack

34

of animus toward women. Affidavits submitted by Ms. Knutson from other female employees undermine Ms. Knutson's hostile work environment claim. According to Ms. Campbell, Mr. Vandervort sought to dominate the office and disliked being confronted or questioned. Because of his frequent "WTF" look, Mr. Harum drew a caricature of him. Mr. Vandervort and Mr. Bredesen butted heads and screamed at each other. According to Ms. Campbell, a running joke in the school district office was that one needed to treat Mr. Vandervort like a weapon and "point him away from you." Ms. Campbell did not claim that Mr. Vandervort singled out only females for this hostile conduct, but gave the example of Mr. Vandervort yelling at another male employee. Ms. Mueller testified that she avoided Mr. Vandervort because of his boorish behavior toward Ms. Knutson and others. She did not testify that Mr. Vandervort engaged in this boorish behavior only toward women.

Ms. Knutson argues that although Mr. Vandervort may have also treated others rudely, Mr. Vandervort's rude treatment of her was motivated by a spurned love and thus should be considered the result "of sex." According to Ms. Knutson, Mr. Vandervort treated her poorly because she violated the implied condition of employment to submit to his flirtations. The record however reflects that Mr. Vandervort voluntarily ended the flirtations when he learned Ms. Knutson had a boyfriend.

*2. Pervasiveness*

35

The third element of a hostile work environment requires a pervasive discriminatory atmosphere. In deciding whether the relevant conduct was severe or pervasive enough to affect the terms and conditions of employment, the court must look at the totality of the circumstances, including the frequency and severity of the conduct, whether it was physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Washington v. Boeing Co.*, 105 Wn. App. 1, 10, 19 P.3d 1041 (2000). "Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law." *Id.* In addition, the conduct must be objectively and subjectively abusive. *Adams*, 114 Wn. App. at 297. In order to adversely affect employment, the harassing conduct must "amount to a change in the terms and conditions of employment." *Id.*

As the United States Supreme Court noted in *Faragher v. City of Boca Raton*:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.

524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (citations omitted) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed.

36

2d 201 (1998); BARBARA LINDEMANN & DAVID D. KADUE, SEXUAL HARASSMENT IN
EMPLOYMENT LAW 175 (1992)).

The conduct of Mr. Vandervort before October 2008 falls short of creating a
pervasive discriminatory atmosphere. Ms. Knutson did not find any of the conduct
offensive, and Ms. Knutson does not assert that the remarks and behavior impacted her
job performance. However, whether the conduct after October 2008 created a pervasive
hostile environment is a closer call.

Ms. Knutson relies on *Campbell*, 129 Wn. App. at 19, to support her argument that
she created an issue of fact as to harassment that affected the terms and conditions of her
employment. She contends *Campbell* is on point because the plaintiff was mocked and
yelled at by her superior. But there is much more discriminatory behavior in the
*Campbell* case. There, Meredith Campbell worked as the secretary for Eastern
Washington University's Military Science Department. *Id.* at 14. Major Leaf Rich and
Lieutenant Colonel Charles Green had faculty status in the department. Lieutenant
Colonel Green was the department chair. *Id.* at 15. Shortly after she began work, Ms.
Campbell heard Major Rich make derogatory comments about women and the major told
her to be more subdued and not so direct. *Id.*

Lieutenant Green reprimanded Ms. Campbell for asking work study students not
to remove items from her desk and told her that her "' desk will be raped on a daily basis

whether you like it or not.'" *Id.* at 16 (internal quotation marks omitted). He also told

her that women should not work, men are the leaders of the family, and women should

obey them. Ms. Campbell found this behavior offensive. Major Rich commented to Ms.

Campbell that she caught people off guard by walking up and talking to them because she

was so small and fragile looking. He further told her other women on campus would be

jealous of her because she was petite and had a good body. The major said she would

wear out her boyfriend unless she straightened out her personality.

Major Rich sent an e-mail entitled "Don't Bother Me Button" to Ms. Campbell

and other members of the department. *Id.* The e-mail had a video attachment showing a

log swinging from one side of the screen directly into a woman and forcibly removing

her. In the body of the e-mail, the major said it was "'time to have a little fun with

Meredith.'" *Id.* He also said their superiors had authorized him to outfit their computers

with this device just for Ms. Campbell. Lieutenant Colonel Green sent an e-mail entitled

"Our Work Environment" to Ms. Campbell and others in the department. The message

was in response to the major's earlier e-mail to the department that explained why

alcohol should be served at work and also contained sexual references. The major sent an

e-mail entitled "Men and Women Switchboard" to Ms. Campbell and others. It implied

women were impossible to figure out. Ms. Campbell was the only female recipient. *Id.*

In a performance evaluation of Ms. Campbell, Major Rich wrote that she was

expected to clean up the kitchen and common areas. When she objected that these duties were not part of her job, Major Rich informed her that these types of chores were "'women's work.'" *Id.* at 17 (internal quotation marks omitted). Other incidents made Ms. Campbell uncomfortable, including being yelled at, mocked, and ignored. On one occasion, Ms. Campbell was leaving work when Major Rich blocked her from leaving. All of these events occurred during a three-month period. *Id.* at 16-17.

The facts here are not nearly as egregious as those in *Campbell*. Mr. Vandervort's aloofness, rudeness, and occasional yelling at Ms. Knutson undoubtedly caused her discomfort, but are more akin to the ordinary tribulations of the workplace rather than extreme conduct that is actionable. Ms. Knutson's evidence falls short of showing a pervasive hostile work environment that affected the terms and conditions of her employment.

In conclusion, Ms. Knutson fails to raise genuine issues of material fact to establish two of the four elements of her hostile work environment claim. The trial court properly granted the school district's motion for summary judgment dismissal of Ms. Knutson's hostile work environment claim.

C.     *Whether Ms. Knutson's retaliation claim survives summary judgment*

Finally, Ms. Knutson claims that her termination from employment constitutes retaliation in violation of WLAD. RCW 49.60.210(1) reads:

39

It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

To establish a violation of RCW 49.60.210 for retaliatory discharge, an employee must show (1) she or he engaged in a statutorily protected opposition activity, (2) an adverse employment action was taken, and (3) a causal link between the former and the latter. *Delahunty v. Cahoon*, 66 Wn. App. 829, 839, 832 P.2d 1378 (1992). If the employee fails to establish a prima facie case, then the defendant employer is entitled to summary judgment as a matter of law. *Hill v. BCTI Income Fund-1*, 144 Wn.2d 172, 181, 23 P.3d 440 (2001), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006). If the employee succeeds in establishing a prima facie case, the burden shifts to the employer to produce admissible evidence of a legitimate, nonretaliatory reason for its adverse employment action. *Renz v. Spokane Eye Clinic, PS*, 114 Wn. App. 611, 618, 60 P.3d 106 (2002).

### 1.   *Prima facie case*

In December 2008, Ms. Knutson reported a hostile work environment to the Wenatchee School District's human resources department. She need not prove that her complaint of discrimination was valid, only that she reported discrimination. *Id.* at 619. An employee who opposes employment practices reasonably believed to be

discriminatory is protected by the "opposition clause" whether or not the practice is actually discriminatory. *Graves v. Dep't of Game*, 76 Wn. App. 705, 712, 887 P.2d 424 (1994). Because Ms. Knutson engaged in protected activity, she has satisfied the first element of her prima facie retaliation case.

Ms. Knutson was terminated on June 30, 2011. Ms. Knutson, therefore, has satisfied the second element of her prima facie retaliation claim.

Finally, Ms. Knutson must establish a causal link between Ms. Knutson's reporting Mr. Vandervort's conduct and her termination from employment. The school district argues that Ms. Knutson cannot make out a prima facie case on this element. In a recent decision, the United States Supreme Court held that in a Title VII retaliation suit, the plaintiff must show that "but for" her protected action, there would have been no adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___U.S.___, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). Washington law imposes a looser standard, evaluating whether retaliation was a "substantial factor" motivating the discharge. *Allison v. Hous. Auth.*, 118 Wn.2d 79, 95-96, 821 P.2d 34 (1991).

Proximity in time between the protected activity and adverse employment action, along with evidence of satisfactory work performance, suggests an improper motive. *Kahn v. Salerno*, 90 Wn. App. 110, 130-31, 951 P.2d 321 (1998). Ms. Knutson complained repeatedly of Mr. Vandervort's aloofness and shouting at her from October

2008 until at least October 2010. The school district disciplined Ms. Knutson in February 2011 and terminated her in June 2011. Issues of material fact exist as to satisfactory work performance. Ms. Knutson claims that her inability to provide a budget was due to the district's refusal to provide her information and adequate training. Because there is close proximity in time between her complaints and the adverse employment action, and because there are disputed issues of material fact concerning satisfactory job performance, Ms. Knutson has set forth a prima facie case of retaliation.

2. *Pretext*

This court must next apply the *McDonnell Douglas* burden-shifting scheme to determine the question of pretext. *Hill*, 144 Wn.2d at 182 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). The school district argues that Ms. Knutson failed to provide a prima facie case but, even if she did, it had legitimate grounds for the elimination of the director of day care programs due to the budget crisis and the program's lack of self-sufficiency.

As noted above, the school district board of directors asked the administration to review all "self-sufficient" programs that were operating at a deficit to determine if they could be eliminated to help balance the budget. As early as April or May 2011, Mr. Harum advised Ms. Knutson that her program was being scrutinized because it was losing money every year. Mr. Harum indicated that the program could no longer justify

42

the position of director. The administrative cabinet made several budget cutting recommendations to the board, including the elimination of 33 staff positions, which included Ms. Knutson's director of school age care position.

Once the employer provides evidence of a legitimate nonretaliatory reason for eliminating the former employee's position, then the burden shifts back to the former employee to show that the employer's reason is actually a pretext for what, in fact, was a retaliatory purpose for its adverse employment action. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 364, 753 P.2d 517 (1988); *Renz*, 114 Wn. App. at 618-19. If the former employee fails to make this showing, the employer is entitled to judgment as a matter of law. *Renz*, 114 Wn. App. at 619.

To prove pretext, the employee must produce substantial evidence that the justification forwarded by the employer is unworthy of belief. *Kuyper v. State*, 79 Wn. App. 732, 738, 904 P.2d 793 (1995). "'Speculation and belief are insufficient to create a fact issue as to pretext. Nor can pretext be established by mere conclusory statements of a plaintiff who feels that he has been discriminated against.'" *Hines v. Todd Pac. Shipyards Corp.*, 127 Wn. App. 356, 372, 112 P.3d 522 (2005) (quoting *McKey v. Occidental Chem. Corp.*, 956 F. Supp. 1313, 1319 (S.D. Tex. 1997)). The former employee must demonstrate pretext by showing that the employer's articulated reason for elimination of her position had no basis in fact or was not the real motivating factor for

43

its adverse employment decision. *Kuyper*, 79 Wn. App. at 738.

Ms. Knutson attempts to establish that the school district's justification is unworthy of belief by showing that the district's revenues exceeded its costs in every year, including the year when the district terminated her employment. But for Ms. Knutson to actually establish pretext, she must establish that someone in the administrative cabinet who knew she had reported suspected retaliation created a false budget emergency that caused the elimination of 33 positions, including Ms. Knutson's own. The trial court found this incredulous. So do we. The fact that the administrative cabinet recommended the elimination of 33 employees is overwhelming evidence that it had a bona fide belief that the district faced a budget emergency. Because a reasonable trier of fact cannot find the employer's budget emergency justification unworthy of belief, summary judgment was appropriate.

CONCLUSION

We do not countenance Mr. Vandervort's alleged behavior. However, viewing the facts in the light most favorable to Ms. Knutson, Mr. Vandervort's post-October 2008 actions toward her were not because of sex, nor did those actions sufficiently affect the terms or conditions of her employment. Further, despite establishing a prima facie case of retaliation, she cannot establish that the school district's justification was pretextual. Although one might reasonably conclude that Ms. Knutson was treated unfairly or even

44

harshly, under the law her claims are not actionable. We deny any award of costs to the school district.

Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Korsmo, J.

Fearing, J.